
Kevin W. Barrett
Michael B. Hissam (VSB #76843)
Special Assistant Attorneys General
   for the State of West Virginia
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Tel:  (304) 345-6555
Fax:  (304) 342-1110

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| ALPHA NATURAL RESOURCES, INC., *et al.*, | Case No. 15-33896 (KRH) |
| Debtors. | Jointly Administered |
| WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Plaintiff, | |
| v. | Adv. Proc. No. _____ |
| ALPHA NATURAL RESOURCES, INC., CONTURA ENERGY, INC., CITICORP NORTH AMERICA, INC., as Agent, KEVIN S. CRUTCHFIELD, ANDY EIDSON, GARY W. BANBURY, KEITH HAINER, MARK M. MANNO, and KEVIN STANLEY, | |
| Defendants. | |

**COMPLAINT**

### I.  INTRODUCTORY STATEMENT

1. The West Virginia Department of Environmental Protection ("DEP") entered into a settlement agreement with the debtors and reorganized debtors in these chapter 11 cases,

1

Contura Energy, Inc., and Citicorp North America, Inc., as agent for the first-lien lenders.  The settlement resolved one of the chief impediments to confirmation of the debtors' chapter 11 plan and the first-lien lenders' acquisition of the debtors' crown jewel assets.  Inasmuch as the settlement agreement stretched out the reorganized debtors' environmental obligations at their West Virginia mining sites for more ten years, DEP expressly premised the settlement upon the financial projections the debtors attached to their court-approved disclosure statement.

2. The reorganized debtors recently disclosed, however, that those projections were materially false and misleading when made, the debtors having failed to properly account for as much as $100 million in known (or at least knowable) liabilities under their agreement with Contura.

3. The failure to properly account for those liabilities in the disclosure statement projections cannot reasonably be characterized as an error or mistake.  Alpha's senior management, including each of the individual defendants named above who prepared the projections, effectively sat on both sides of the Contura transaction and, in that position, had intimate and unique knowledge of the debtors' business operations and affairs and the terms and provisions of the agreement governing that transaction.  Further, their knowledge and intent may properly be attributed to both the debtors and Contura.

4. As DEP and other parties in interest pointed out in filed pleadings, the reorganized debtors' prospects and projections were dicey enough as it was.  But the additional $100 million in previously undisclosed liabilities materially worsen their prospects, materially increase the risk that the reorganized debtors will fail, and materially reduce the amount of money the reorganized debtors may commit to their still massive environmental liabilities.  Moreover, the additional undisclosed liabilities may well reduce the excess cash flow required to

be paid into the DEP-controlled reclamation accounts established under the DEP settlement agreement.

5. In turn, the undisclosed liabilities materially increase the probability that DEP will be left with claims under the surface-mining and other environmental laws against the individuals and entities in ownership and control positions with respect to the debtors' mining operations, including each of the individual defendants who comprised the debtors' former senior management. Pursuant to the settlement agreement, however, DEP, in reliance upon the debtors' prospects and projections, released those very same individuals.

6. DEP believes, however, that it is too late to unwind the DEP settlement or the debtors' plan. Far too many parties have changed their positions in reliance on the settlement and the plan, and there appears to be no conceivable way to restore even the parties to the settlement to their positions prior to entering into the settlement agreement. DEP, accordingly, does not seek any relief as to the debtors, Contura, or the first-lien lenders. Instead, it asks this Court only to undo the releases and other relief granted to the debtors' former senior management under the settlement agreement and, to the extent applicable, the debtors' plan and the confirmation order.

7. To ensure the enforcement of the surface-mining and other environmental laws and protect the State of West Virginia in the event the reorganized debtors should fail and default in the performance of their legal obligations, DEP seeks a declaratory judgment of this Court that the releases and other relief granted to Alpha's senior management are void and unenforceable as having been procured by material misrepresentation and fraud.

## II.  JURISDICTION

8. This Court has subject matter jurisdiction to consider this matter under 28 U.S.C. § 1334.

9. This action also falls within the jurisdiction retained pursuant to its order confirming the debtors' chapter 11 plan.

10. This is a core proceeding under 28 U.S.C. § 157(b).

11. Venue is proper before this Court in accordance with 28 U.S.C. § 1409.

## III. FACTUAL BACKGROUND

12. The debtors commenced these chapter 11 cases on August 3, 2015.

13. At the time they commenced these cases, the debtors comprised West Virginia's largest coal mine operator, holding more than 500 DEP-issued coal mining permits in West Virginia.

14. The debtors also held the distinction of being the last West Virginia coal mine operators to hold self-bonded coal-mining permits.  As of the commencement date of the chapter 11 cases, the debtors had self-bonded roughly $244 million of the reclamation obligations under their West Virginia permits.

15. Initially after commencing its chapter 11 cases, the debtors sought primarily to pursue a traditional reorganization with the disposition of a limited number of inactive mines, mostly in West Virginia, and a reorganization of the greater entity.

16. To that end, Alpha filed a motion on October 15, 2015 seeking to auction off sixteen mining complexes, including eleven West Virginia mining complexes, along with a limited number of complexes in other states.

17. As the debtors told it, however, the coal market continued unexpectedly and unrelentingly to deteriorate throughout the pendency of the chapter 11 cases, leading the debtors, in consultation with their first-lien lenders, to pursue a more substantial operational restructuring.

18. After obtaining approval for the initial auction, the debtors continued to modify the list of complexes included in that auction until, eventually, they sought to auction off all of their West Virginia mining complexes, other than one small portion of one such complex the first-lien lenders had agreed to take in a credit-bid sale.

19. The debtors subsequently stated that they had received little, if any, real interest from potential purchasers of the West Virginia assets.

20. Faced with that alleged prospect, the debtors, continuing to work with their first-lien lenders, developed a revised restructuring plan pursuant to which the debtors would sell their crown jewel assets to the first-lien lenders in a stand-alone, no cash, credit-bid sale pursuant to section 363 of the Bankruptcy Code and reorganize around their remaining assets, continuing to mine coal at certain complexes in large part to fund the reclamation of its remaining complexes.

21. On April 15, 2016, DEP objected to the debtors-first-lien lenders' proposed restructuring, as, among other things, it proposed to leave the debtors and reorganized debtors without sufficient assets or cash flow to perform their legal obligations to bond and reclaim their remaining mining sites.

22. Shortly thereafter, in early June, DEP and the debtors reached an agreement in principle with respect to the bonding and reclamation of the debtors' sites in West Virginia.

23. DEP, the debtors, Contura, and Citicorp North America, Inc., as agent for the first-lien lenders, subsequently entered into a definitive settlement agreement in early June 2016.

24. Insofar as is pertinent here, the DEP settlement agreement provided for:

5

   a. The immediate bonding of all of the reorganized debtors' self-bonded active and inactive mining sites in West Virginia;

   b. A ten-year compliance schedule for the bonding of the debtors' other remaining sites in West Virginia; and

   c. The reclamation of the latter sites on an ongoing basis with funding secured by future contributions to collateralized reclamation accounts of a pro rata portion of $209 million over ten years from the reorganized debtors and Contura, plus additional contributions, to the extent earned, of a portion of the reorganized debtors' excess cash flow.

25. The DEP settlement ultimately became a cornerstone of the debtors' chapter 11 plan and served as the starting point for the debtors' resolution of similar issues in each of the other States in which they operated.

26. Because the reorganized debtors' ability to perform their legal obligations to reclaim their mining sites depended on their ability to continue to function over the long run and, indeed, at least $109 million of the secured funding for reclamation of the reorganized debtors shuttered mine sites would flow over a ten-year period, the reorganized debtors' projected cash flows were critical to DEP's willingness to enter into the settlement.

27. To that end, the definitive settlement agreement included a specific condition to its effectiveness relating to the debtors' projected cash flows. In particular, section 10(g) of the settlement agreement provided:

> There shall be no material adverse changes to the business plan and projections of the Purchaser or the Reorganized Debtors filed with the Bankruptcy Court prior to May 25, 2016 or the business or operations of the Purchaser or the Reorganized Debtors, taken as a whole.

28. Had there been a change to the debtors' referenced business plan and projections of a magnitude like the reorganized debtors have now disclosed, DEP would have had the right to terminate the settlement agreement and pursue other options with respect to the debtors' bonding and reclamation obligations.

6

29. The debtors' projections were, in fact, razor thin on their face. Over the full four and one-half year projection period, the debtors projected cash flow from operations of just $146 million. Including contemplated capital expenditures, the debtors' cash flow turned decidedly negative to the tune of $87 million over the projection period.

30. The inclusion of some $100 million in additional cash demands on the reorganized debtors would only have exacerbated an already precarious reorganization by a factor of two or more.

31. The debtors did not, however, disclose any additional obligations or cash demands, did not revise the projections, and, instead, attached those same projections to the court-approved disclosure statement pursuant to which the debtors solicited acceptances or rejections of the plan.

32. At the confirmation hearing on July 7, 2016, the debtors also proffered those same projections as their principal evidence of the feasibility of the debtors' chapter 11 plan.

33. By order dated July 12, 2016, the Court entered its order finding the plan feasible based expressly upon the proffered projections and confirming the debtors' chapter 11 plan.

34. On July 26, 2016, DEP and the other parties consummated the DEP settlement, and the debtors' chapter 11 plan became effective.

35. Pursuant to and in accordance with section 8(a)(i) of the DEP settlement agreement, DEP (a) released, among others, the debtors' officers and employees who would become employed by Contura, including each of the named individual defendants herein, from any claims, violations or conditions arising prior to the effective date of the settlement agreement and (b) committed not to link any of those individuals to the Applicant/Violator System for those claims (hereinafter referred to as the "management releases").

36. On and after the effective date of the plan, the debtors' senior management, including specifically each of the named individual defendants herein, officially assumed their previously anticipated positions as the senior management of Contura.

37. Upon information and belief, the "unaccounted-for obligations" began to materialize almost immediately.

38. By the time the reorganized debtors uncovered the issue just weeks after consummation, they had already suffered millions of dollars in additional obligations not included in the debtors' projections.

39. As the full contours and extent of the "unaccounted-for obligations" became more and more apparent, the reorganized debtors entered into negotiations with Contura and the first-lien lenders.

40. During this time, however, the reorganized debtors did not disclose to DEP either the incurrence of the additional unaccounted-for obligations or the negotiations, and instead conveyed to DEP an air of normalcy and confidence.

41. But, on October 31, 2016, just three months after consummating the plan, the reorganized debtors first advised DEP that the debtors' projections had failed to account for $100 million in obligations allegedly owing by them in accordance with their asset purchase agreement with Contura and simultaneously previewed their settlements with Contura and the first-lien lenders designed to offset some portion of the resulting $100 million shortfall in the cash flow projections.

42. Three days later, the reorganized debtors filed a motion seeking approval of the settlements.

43. The reorganized debtors' motion suggests that the settlements may reduce the unaccounted-for cash shortfall by approximately $52 million or more.

44. DEP doubts the extent of the actual reduction in the unaccounted-for obligations.

45. Nevertheless, DEP did not oppose the reorganized debtors' proposed settlements, instead reserving its rights to pursue its own claims, including seeking to invalidate any previously given releases.

### IV. CLAIMS FOR RELIEF

46. At all relevant times, including when the debtors disseminated their disclosure statement and sought confirmation of their chapter 11 plan and the parties consummated the DEP settlement and the debtors' plan, each of the named individual defendants knew (or certainly should have known) that the debtors' projections were materially false and misleading.

47. At all relevant times, including when the debtors disseminated their disclosure statement and sought confirmation of their chapter 11 plan and the parties consummated the DEP settlement and the debtors' plan, each of the named individual defendants knew (or certainly should have known) that DEP was relying on the debtors' projections in entering into and consummating the DEP settlement, including granting the management releases.

48. At all relevant times, including when the debtors disseminated their disclosure statement and sought confirmation of their chapter 11 plan and the parties consummated the DEP settlement and the debtors' plan, each of the defendants knew (or certainly should have known) that the debtors' management may have continuing liability for the reorganized debtors' failure to complete reclamation or treat polluted water under their continuing mining permits in West Virginia.

49. At all relevant times, including when the parties consummated the DEP settlement and the debtors' plan, each of the defendants knew (or certainly should have known) that the continuing liability of the debtors' management threatened Contura's ability to conduct business in the future, as Contura would employ the debtors' management and would itself be permit-blocked in the event the debtors' management became liable for the reorganized debtors' failure to complete reclamation or treat polluted water under their continuing mining permits in West Virginia.

50. In knowingly making or allowing to be made, false and misleading projections to obtain confirmation of the debtors' chapter 11 plan, each of the named individual defendants committed a fraud upon this Court.

51. In consummating the DEP settlement and the plan, each of the named individual defendants procured DEP's release of the debtors' management by material misrepresentation and fraud.

**Count I**
**(Declaratory Relief)**

52. DEP repeats and re-alleges each and every allegation contained in paragraphs through 51 above as if fully set forth herein.

53. An actual justiciable controversy exists among the parties as to whether the defendants' conduct renders the management releases void and unenforceable.

54. DEP's failure to bring this action and seek to void the management releases now might hereafter prejudice its ability to pursue claims against the debtors' management as a result of the management releases.

55. The named individual defendants' fraud upon the Court and procurement of the management releases from DEP by material misrepresentation and fraud renders the management releases void and unenforceable.

56. None of the other defendants, including specifically Contura and the first-lien lenders, will be prejudiced by voiding the management releases.

## Count II
### (Revocation of Confirmation Order)

57. DEP repeats and re-alleges each and every allegation contained in paragraphs through 56 above as if fully set forth herein.

58. Section 1144 of the United States Bankruptcy Code provides that on request of a party in interest at any time before 180 days after the date of the entry of an order of confirmation, the court may revoke an order of confirmation procured by fraud.

59. A proceeding to revoke an order confirming a chapter 11 plan constitutes an adversary proceeding.

60. DEP has commenced this adversary proceeding within 180 days after the July 12, 2016 entry of this Court's order confirming the debtors' chapter 11 plan.

61. The named individual defendants procured the confirmation order by fraud.

62. As the named individual defendants' procured the confirmation order by fraud, they did not acquire any rights in good faith reliance on the confirmation order.

63. None of the other defendants, including specifically Contura and the first-lien lenders, will be prejudiced by voiding the management releases.

64. Entry of the limited relief requested herein adequately protects any other entities who acquired rights in good faith reliance on the confirmation order.

## V.  DEMAND FOR RELIEF

WHEREFORE, DEP requests that the Court enter an order granting judgment in its favor as follows:

(A) Declaring that the management releases granted to the individual Defendants named herein are void and unenforceable;

(B) Declaring that any other applicable provisions of the debtors' chapter 11 plan and the confirmation order are void and unenforceable to the extent that they release the named individual defendant from liability to DEP or the State of West Virginia for any claims, violations or conditions arising prior to the effective date of the settlement agreement;

(C) Declaring that DEP may link each of the individual Defendants to the Applicant/Violator System with respect to Alpha Natural Resources, Inc. and its affiliates;

(D) Revoking the debtors' chapter 11 plan to the extent required to declare the management releases granted to each of the individual Defendants named herein are void and unenforceable; and

(E) Granting DEP such other and further relief as may be just.

Dated:  November 16, 2016            */s/ Kevin W. Barrett*

Kevin W. Barrett
Michael B. Hissam (VSB #76843)
Special Assistant Attorneys General
    for the State of West Virginia
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Tel:  (304) 345-6555
Fax:  (304) 342-1110
kbarrett@baileyglasser.com
mhissam@baileyglasser.com

*Attorneys for the West Virginia Department of Environmental Protection*