**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100
James C. Tecce (pro hac vice pending)
Corey Worcester (pro hac vice pending)
Eric M. Kay (pro hac vice pending)

*Special Litigation Counsel to Reorganized Debtors*

**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:   (804) 788-8200
Facsimile:   (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Counsel to Reorganized Debtors*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>Alpha Natural Resources, Inc., *et al.*,<br><br>　　　　　　Debtors. | Chapter 11<br>Case No. 15-33896 (KRH)<br>(Jointly Administered) |
| West Virginia Department of Environmental Protection,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Alpha Natural Resources, Inc., Contura Energy, Inc., Citicorp North America, Inc., as Agent, Kevin S. Crutchfield, Andy Eidson, Gary W. Banbury, Keith Hainer, Mark M. Manno, and Kevin Stanley,<br><br>　　　　　　Defendants. | Adv. Proc. No. 16-03334 (KRH) |

**MOTION OF REORGANIZED DEBTORS TO DISMISS THE COMPLAINT OF THE WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

ANR, Inc. and its affiliates, Reorganized Debtors in the above-captioned cases (collectively, "ANR"),[1] hereby (a) move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure, to dismiss the Complaint filed by the West Virginia Department of Environmental Protection ("DEP") in the above captioned adversary proceeding, and (b) respectfully represent as follows:

## PRELIMINARY STATEMENT

1. DEP's adversary proceeding is holding up a pair of hard-won settlements that are important to ANR and its long-term success and viability.

2. On July 26, 2016, ANR emerged from chapter 11 protection in accordance with the negotiated terms laid out in the Plan and approved by the Court in the Confirmation Order following extensive submissions and evidentiary hearings. Among other things, the Plan compromised several billion dollars in claims, authorized the sale of certain core assets to Contura, and left ANR as a smaller operating entity that would maintain an active coal mining operation and continue to perform reclamation in cooperation with government entities.

3. The coal market that ANR faced upon emergence from chapter 11 was and remains a challenging one. And, unfortunately, shortly after emergence it became clear to ANR that certain tax, payroll, and other expenses—totaling perhaps as much as $100 million—were not accounted for in the Plan, the projections on which the Plan was based, or in any Plan reserves (the "Unprojected Costs"). Because the Unprojected Costs were not reflected in the

---

[1] Herein (a) "ANR" refers to the entities that emerged from chapter 11 protection on July 26, 2016 and their affiliated Reorganized Debtors; (b) "Alpha" or the "Debtors" refers collectively to chapter-11-debtor Alpha Natural Resources, Inc. n/k/a Old ANR, LLC and its affiliated debtors and debtors in possession in the above-referenced chapter 11 cases (the "Bankruptcy Cases"); (c) "Contura" refers to Contura Energy Inc.; and (d) capitalized terms not otherwise defined have the meanings ascribed to them in the Second Amended Joint Plan Of Reorganization Of Debtors And Debtors In Possession As Modified, dated August 18, 2016 [ECF No. 3283] (the "Plan").

Plan, projections, or reserves, it was not clear who would, should, or even could bear the burden of paying them.

4. If ANR were required to pay them, the Unprojected Costs would eliminate almost all of the working capital that the parties and the Court expected ANR to have upon emergence under the Global Settlement incorporated into the Plan. And if ANR were forced to litigate the issue of the Unprojected Costs with Contura and the First-Lien Lenders, ANR would be forced to incur legal fees and divert its focus from implementing the Plan and operating ANR's business, all with the possibility of an unfavorable resolution. Even if the outcome of litigation were positive, the costs of obtaining such a litigated outcome could be more damaging than any realized benefit. Accordingly, without a near-term resolution of the Unprojected Costs issue, ANR's long-term success and viability are threatened.

5. To solve the problem of the Unprojected Costs without pursuing litigation, ANR, Contura, and the First-Lien Lenders negotiated (with considerable effort and not a few threats of litigation) two settlements that they believe will restore ANR to the position that everyone believed it was in upon emergence—able to operate feasibly and implement the terms of the Plan. The negotiations were extensive and conducted in good faith and at arm's length.

6. All of the settlement parties believe that the settlements will leave ANR in a better financial position. Indeed, DEP appears to believe the same (Cmpl. ¶ 6) and did not object to the approval of the settlements.

7. Nonetheless, and perhaps ironically given its stated concern over ANR's liquidity, it is DEP that is now threatening ANR's future success by holding up the settlements and the financial boost that those settlements will provide. DEP is doing so by pursuing the above-captioned adversary proceeding that challenges the conduct of certain parties, seeks to unwind provisions of the Confirmation Order, and undermines the ability of the settlement parties to

consummate the settlements as described below. If DEP prevails in confounding the settlements, it will place ANR at a greater risk of financial harm and necessitate significant litigation by ANR against Contura, the Pre-Petition Agent, and the Pre-Petition Lenders as the only means to address the Unprojected Costs.

8. ANR compromised those claims on terms that it considered, in the exercise of its business judgment, to present an acceptable alternative—and, in fact, the best available alternative. DEP should not be entitled to upset that decision through a collateral attack on the settlements that places ANR's future at greater risk.

9. DEP's above-captioned adversary proceeding (the "Adversary Proceeding") was filed on November 16, 2016. It seeks partial revocation of (i) this Court's July 12, 2016 Confirmation Order, and (ii) certain releases that even DEP concedes were "a cornerstone of the debtors' chapter 11 plan." (Cmpl. ¶ 25.)

10. Contura has made clear that it will not proceed with the settlement agreement until the Adversary Proceeding is resolved. And the First-Lien Agent has made clear that it will not proceed with a settlement unless Contura does.

11. Accordingly, ANR asks the Court to resolve the Adversary Proceeding promptly to eliminate the continuing jeopardy to ANR caused by the Unprojected Costs and its various disputes with Contura, the First-Lien Agent, and the First-Lien Lenders. Fortunately, the Adversary Proceeding can be resolved promptly because the Complaint is fatally flawed in at least three ways.

12. *First*, the Complaint fails to state a claim upon which relief can be granted because the Complaint seeks to sever the Confirmation Order and the Plan and have each revoked partially. Pursuant to section 1144 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), the Court has the power to fully revoke a

confirmation order, but **not** to partially do so.  Indeed, ANR believes that every court to consider the issue has reached the same conclusion.

13.     *Second*, DEP concedes that the Plan cannot be revoked in its entirety.  As DEP itself acknowledges (Cmpl. ¶ 6), at this late stage there is no way that the Court can reinstate the *status quo* as it existed prior to the confirmation of the Plan.  The Reorganized Debtors, creditors, and other stakeholders have relied on the Plan in innumerable ways, including to make payments and enter into agreements.  Entities have been merged or dissolved under the Restructuring Transactions.  Contura has purchased and operated assets as part of a new business enterprise and other assets have been transferred among the Reorganized Debtors to implement their restructuring.  At this point, the proverbial eggs cannot be unscrambled.  Accordingly, revocation of the Confirmation Order and the Plan should be rejected under the doctrine of equitable mootness.

14.     *Third*, the Complaint fails to adequately plead fraud.[2]  In particular, DEP has not alleged specific facts from which the Court could determine that the individual defendants *knew* that the financial projections they were presenting to the Court were wrong.  Nor has DEP alleged specific facts indicating that the individual defendants intended to defraud the Court—the only party that matters in a section 1144 analysis.  Without such allegations, the Complaint fails to state a claim.

15.     For each of these independent reasons, the Complaint fails to state a claim and should be dismissed with prejudice.

---

[2] Bankruptcy Rule 7009 makes Rule 9 of the Federal Rules of Civil Procedure applicable to adversary proceedings.  *See* Fed. R. Bankr. P. 7009.

4

## RELEVANT FACTUAL BACKGROUND

### A. Bankruptcy and Emergence

16. On August 3, 2015, Alpha commenced the Bankruptcy Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By order of the Court, the Bankruptcy Cases were consolidated for procedural purposes and were being jointly administered.

17. On May 25, 2016, Alpha filed the Plan. The Plan "was universally accepted in accordance with § 1126(c) of the Bankruptcy Code by all of the impaired creditor classes that were entitled to vote." (Memorandum Opinion [Main Case ECF No. 3347] (the "Memorandum Opinion" at 1-2).) On July 12, 2016, following an evidentiary hearing, the Court entered the Confirmation Order confirming the Plan.

18. On July 26, 2016 (the "Effective Date"), the Plan became effective in accordance with its terms and ANR emerged from bankruptcy as part of the Reorganized Debtors.

### B. The Unprojected Costs

19. The Plan, the Confirmation Order, and other related documents (including transaction documents for the NewCo Asset Sale) identify the treatment of various pre-petition and post-petition obligations of ANR.

20. During the course of the Reorganized Debtors' efforts to implement the Plan following the Effective Date, the Reorganized Debtors identified certain obligations that (a) relate to the assets sold to Contura, and (b) as far as the Reorganized Debtors can determine, were not (i) accounted for in the projected uses of the Exit Funding for the Reorganized Debtors or (ii) included in the reserves established under the Plan by the Reorganized Debtors and approved by order of the Court.

5

21. The Reorganized Debtors estimate that the total amount of these Unprojected Costs could approach $100 million.

**C.     The Settlements**

22. Following the Effective Date of the Plan, certain disputes arose between ANR and Contura regarding obligations under the Stalking Horse APA consummated through the Plan, including with respect to the Unprojected Costs. Ultimately, with respect to the Unprojected Costs, the First Lien Agent, Contura, and the Reorganized Debtors all disputed responsibility for funding these amounts.

23. After extensive arms' length negotiations over an extended period, these matters were resolved by (i) a settlement agreement between ANR and Contura (the "Contura Settlement") and (ii) a settlement agreement between ANR and the First-Lien Agent (the "First-Lien Settlement" and, with the Contura Settlement, the "Settlements").

24. By the Settlements, the parties agreed to an appropriate treatment of the obligations by which each will share the burden of satisfying these liabilities (to the extent valid) from agreed funding sources.

25. The parties to the Settlements believe they will aid in the implementation of the Plan and ANR's long-term success. On November 3, 2016, the Reorganized Debtors filed the *Motion of Reorganized Debtors, Pursuant to Bankruptcy Rule 9019, for an Order Approving Settlement Agreements with Contura Energy, Inc. and First Lien Agent in Connection with the Implementation of the Plan* [Main Case ECF No. 5325] (the "Settlement Motion").

26. The Settlements are indisputably in the best interests of ANR. Consequently, it is not surprising that DEP states that it is ***not*** seeking to upset them. (Cmpl. ¶ 6.)

27. Indeed, following ANR's filing of the Settlement Motion, DEP filed a response expressly stating that it did not oppose the Settlements. [Main Case ECF No. 3542]

6

### D.    The Adversary Proceeding

28.    Nonetheless, on November 16, 2016 (on the eve of the hearing on the Settlement Motion), DEP took action that stalled the Settlements with even more certainty than if it had objected to them.  DEP commenced this Adversary Proceeding against ANR, Contura, Citicorp (as First-Lien Agent), and a number of individuals in the management team of Contura.  [Adv. Proc. ECF No. 1]

29.    As Contura and the First-Lien Agent informed the Court last week, they are unwilling to go forward with the Settlements while the Adversary Proceeding threatens Contura's management.

#### 1.    DEP Seeks a Partial Revocation of the Confirmation Order

30.    Because DEP (correctly) believes it is too late to unwind the Plan, DEP is not seeking a full revocation of the Plan or Confirmation Order.  Specifically, DEP made clear that it:

> believes . . . that it is too late to unwind the DEP settlement or the debtors' plan. Far too many parties have changed their positions in reliance on the settlement and the plan, and there appears to be no conceivable way to restore even the parties to the settlement to their positions prior to entering into the settlement agreement.  DEP, accordingly, does not seek any relief as to the debtors, Contura, or the first-lien lenders.

(Cmpl. ¶ 6.)  Instead, DEP insisted that it is asking only for limited relief:

> it asks this Court only to undo the releases and other relief granted to the debtors' former senior management under the settlement agreement and, to the extent applicable, the debtors' plan and confirmation order.

(*Id.*)

#### 2.    DEP's Generalized Allegations of Fraud

31.    As a basis for "undo[ing] the releases and other relief granted to the debtors' former senior management," the Complaint alleges that the Confirmation Order and DEP

7

settlement agreement (the "DEP Settlement"), which was incorporated into the Confirmation Order and the Plan, were procured by fraud. DEP bases its fraud claim on assertions that:

- "The failure to properly account for [the Unprojected Costs] in the disclosure statement projections cannot reasonably be characterized as error or mistake. Alpha's senior management, including each of the individual defendants named above who prepared the projections, effectively sat on both sides of the Contura transaction and, in that position, had intimate and unique knowledge of the debtors' business operations and affairs and the terms and provisions of the agreement governing that transaction." (Cmpl. ¶ 3.)

- "At all relevant times, including when the debtors disseminated their disclosures statement and sought confirmation of their chapter 11 plan and the parties consummated the DEP settlement and the debtors' plan, each of the named individual defendants knew (or certainly should have known) that the debtors' projections were materially false and misleading." (Cmpl. ¶ 50.)

- "In knowingly making or allowing to be made, false and misleading projections to obtain confirmation of the debtors' chapter 11 plan, each of the named individual defendants committed a fraud upon this Court." (Cmpl. ¶ 50.)

32.    There are no other allegations concerning the alleged fraudulent conduct or fraudulent intent of the individual defendants.

### E.    This Adversary Proceeding Is Harming ANR

33.    DEP's threat against Contura's officers caused Contura to refuse to go forward with the Contura Settlement. Because the First-Lien Settlement is contingent on the approval of the settlement with Contura, the First-Lien Agent has declined to go forward with its settlement. As a result, ANR is left in limbo.

### ARGUMENT

34.    DEP "asks this Court . . . to undo the releases and other relief granted to the debtors' former senior management under" the debtors' plan and confirmation order. (Cmpl. ¶ 6.) It seeks that relief in two ways. *First*, DEP seeks an order "revoking the debtors' chapter 11 plan to the extent required to declare the management releases granted to each of the individual

8

Defendants named herein are void and unenforceable." (Cmpl. at 12, ¶¶ 57-64 (Count 2).)

*Second*, DEP seeks a declaratory judgment "that the management releases granted to the individual defendants named herein are void and unenforceable." (Cmpl. at 12, ¶¶ 52-56 (Count 1).) Because DEP's claims are, effectively, identical, they each fail for the same reasons.

## I. DEP CANNOT OBTAIN A PARTIAL REVOCATION OF THE CONFIRMATION ORDER (ALL COUNTS)

### A. DEP's Request for Partial Revocation Fails as a Matter of Law (Count 2)

35. DEP requests that the Court revoke "the debtors' chapter 11 plan *to the extent required*" to eliminate the releases granted to the individual defendants. (Cmpl. at 12 (emphasis added).) As a matter of law, that request fails at the threshold.

36. The Bankruptcy Code does not permit the Court to revoke a confirmation order "to the extent" desired by a plaintiff, such as DEP. On the contrary, the only revocation decision the Court can make (and one that the Court is not being asked to make here) is an all or nothing decision: "the plain language of section 1144 . . . only provides for revocation of an entire order." *Paul H. Shield, MD, Inc. Profit Sharing Plan v. Northfield Labs, Inc. (In re Northfield Labs. Inc.)*, 467 B.R. 582, 588 (Bankr. D. Del. 2010).

37. Indeed, even a cursory reading of section 1144 is dispositive of DEP's claim:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, ***the court may revoke such order*** if and only if such order was procured by fraud.

11 U.S.C. § 1144 (emphasis added). That language does not leave the Court discretion to revoke part of the Confirmation Order to the "extent" requested by DEP.[3] "Section 1144 simply does not say, as the [Plaintiffs] would need it to say, that the Court can cherry pick, or otherwise

---

[3] Even where a full revocation is contemplated, the decision to revoke a confirmation order is not automatic, but one that rests "in the sound discretion of the court." *Varde Inv. Partners, L.P. v. Comair, Inc. (In re Delta Air Lines, Inc.)*, 386 B.R. 518, 532 (Bankr. S.D.N.Y. 2008). Indeed, the Court's discretion under section 1144 is so broad that "the court may decline to revoke an order of confirmation ***even if*** it finds that the order ***was*** procured by fraud." *Id.* (emphasis in original).

9

choose, the components of the confirmation order that the Court desires to revoke." *Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 501 (Bankr. S.D.N.Y. 2012).

38. As Judge Gerber noted when addressing this same issue in the General Motors bankruptcy, "[t]he word 'revoke', by its nature, is total, and absolute, a construction that is borne out by its definition, as derived from both legal and lay authorities." *Id.*

39. Indeed, every court to consider the issue appears to have reached the same conclusion.[4] Under section 1144, "either an order of confirmation is revoked or it is not." *In re East Shoshone Hosp. Dist.*, 2000 WL 33712301, at *4. Partial revocation is not permissible. *In re CTLI, LLC*, 534 B.R. at 910 ("A motion to revoke confirmation of a plan is absolute; there can be no partial revocation of a confirmation order.").

40. Accordingly, Plaintiff's second count for revocation of the Confirmation Order should be dismissed.

### B.  DEP's Request for Declaratory Relief Should Also Be Dismissed Because Partial Revocation of the Plan Is Not Possible (Count 1)

41. DEP's other request for relief is virtually identical. DEP seeks a declaratory judgment "that the management releases granted to the individual defendants named herein are void and unenforceable." (Cmpl. at 12; Cmpl. ¶¶ 52-56 (Count 1).)

---

[4] *See, e.g., In re Northfield Labs.*, 467 B.R. at 588 (dismissing plaintiffs' complaint seeking partial revocation of confirmed chapter 11 plan because "[t]he plain language of section 1144 . . . only provides for revocation of an entire confirmation order"); *In re E. Shoshone Hosp. Dist.*, No. 98-20934-9, 2000 WL 33712301, at *5 (Bankr. D. Idaho Apr. 27, 2000) (denying debtor's request to partially revoke confirmation order because "there is nothing in the statute, nor has there been authority provided by the debtor, which recognizes or validates a theory of selective or partial revocation"); *Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.)*, 302 B.R. 136, 143 (Bankr. D. Del. 2003) (denying plaintiffs' request that the court enter a revocation order that would leave most of the plan intact but allow plaintiffs to purse claims against non-debtor defendants); *In re CTLI, LLC*, 534 B.R. 895, 910 (Bankr. S.D. Tex. 2015) ("A motion to revoke confirmation of a plan is absolute; there can be no partial revocation of a confirmation order.") (citation omitted).

42. DEP's claim fails, however, because the DEP Settlement was expressly incorporated into the Confirmation Order and is subject to the same limitations against revocation imposed by section 1144 of the Bankruptcy Code. *See* DEP Settlement at 15 (§ 8(b)) (*"*This Settlement Agreement shall be incorporated by reference into the Confirmation Order."*)* [Main Case ECF No. 3010]; *see also* Confirmation Order at 42 (¶ 31) ("The Plan Releases are approved in all respects, incorporated herein in their entirety, so ordered and shall be immediately effective on the Effective Date without further order or action on the part of the Bankruptcy Court, any of the parties to such releases or any other party."); Confirmation Order at 42 (¶ 29) ("[T]he Settlements set forth in or incorporated into the Plan (including, without limitation, . . . the Resolution of Reclamation Obligations . . . ), and all other documents relating to the foregoing, are approved in all respects on a final, non-contingent basis."); Confirmation Order at 27 (¶ GGG) (providing that the Resolution of Reclamation Obligations includes that certain *Permitting and Reclamation Plan Settlement Agreement for the State of West Virginia*).

43. Not only was the DEP Settlement incorporated into the Confirmation Order, but DEP acknowledges that "[t]he DEP settlement ultimately became a ***cornerstone of the debtors' chapter 11 plan*** and served as the starting point for the debtors' resolution of similar issues in each of the other states in which they operated."[5] (Cmpl. ¶ 25 (emphasis added).)

44. Similarly, this Court has acknowledged that "[t]his bankruptcy case was the product of major settlements between each of the large constituencies in this case." (Mem. Op. at 18-19.) Indeed, the releases helped the parties and the Court to "reach the interconnected

---

[5] *See also* Cmpl. at 12 (Demand for Relief) (seeking an order "[d]eclaring that the management releases granted to the individual defendants named herein are void and unenforceable . . . [and] revoking the debtors chapter 11 plan to the extent required to declare the management releases granted to each of the individual Defendants named herein are void and unenforceable").

11

settlements in the face of multiple, significant and competing interests" and without them "this Bankruptcy Case could have become mired in costly, protracted litigation." (*Id.* at 17.)

45. In addressing a request for a stay pending appeal relating to other releases in the Plan, the Court went on to note that:

> As confirmed, the Plan incorporates a delicate balance of settlements involving numerous parties, including (a) the Creditors' Committee, (b) the First Lien Lenders, (c) the First Lien Agent, (d) the Second Lien Parties, (e) the DIP lenders, (f) the DIP Agents, (g) the Massey Convertible Notes Trustee, (h) the Unsecured Notes Trustee, (i) the Retiree Committee, (j) various environmental regulatory authorities, (k) certain agencies of the federal government, (l) certain environmental advocacy groups, (m) the UMWA and (n) the UMWA Funds. ***By the Confirmation Order, the Court found specifically that the release and exculpation provisions of the Plan at issue in the Motion and the Appeal are, among other things, a critical element of the integrated and related Settlements that are the foundation of the Plan and . . . integral to the structure of the Plan and . . . part of the agreement among all parties in interest embodied thereby.***

(*Id.* at 24 (emphasis added).)

46. Therefore, any attack on the releases is a collateral attack on the Confirmation Order and the Plan itself. There is no legitimate dispute concerning whether the releases were a critical component of the Plan—they were.[6]

47. Accordingly, Count 1 fails for the same reasons as discussed above with respect to Count 2: it is an improper attempt to seek a "partial revocation," in violation of section 1144 of the Bankruptcy Code.[7]

---

[6] Indeed, once a settlement or release is incorporated into the Plan, it is treated like any other part of the Plan. *In re Spiegel Inc.*, No. 03-11540, 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006) (applying doctrine of equitable mootness in connection with challenges to non-debtor third party releases as part of a settlement agreement incorporated into a plan of reorganization); *In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000) (applying applicable bankruptcy principles in adjudicating challenges to settlement agreement incorporated into, and made part of, a plan of reorganization).

[7] Even if the DEP Settlement could be considered separately from the Confirmation Order, DEP's Count 1 fails because a contract may only be rescinded in its entirety: "Though a contract (like an order confirming a reorganization plan) may be rescinded in its entirety because it was induced by fraud, modification of a contract in part, without revoking it in whole, raises grave risks of upsetting the expectations of those who provided the necessary assents." *In re Motors Liquidation Co.*, 462 B.R. at 504.

II.   **DEP'S COMPLAINT IS BARRED BY THE DOCTRINE OF EQUITABLE MOOTNESS (ALL COUNTS)**

48.   DEP's claim for revocation would fail even if DEP asked for revocation of the entire Confirmation Order—something that DEP expressly declined to do.

49.   As DEP itself acknowledges, a revocation of the entire Plan is not appropriate here, because the Court is not in a position to return the parties to the pre-Plan *status quo*. (Cmpl. ¶ 6 ("[I]t is too late to unwind the DEP settlement or the debtors' plan. Far too many parties have changed their positions in reliance on the settlement and the plan . . . .").)

50.   Here, as recognized by another court, revocation of the Plan and the Confirmation Order would only serve to "knock the props out from under the authorization for every transaction that has taken place, and would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court." *In re CTLI, LLC*, 534 B.R. at 910 (citation omitted).

51.   The Reorganized Debtors have settled or paid all of their debts under the Plan. Therefore, "[t]he revocation of the Confirmation Order would require the reversal of each and every one of those consummated payments, an unacceptable result for the numerous creditors who are not parties to this dispute." *Id.* at 911 (internal citations omitted).

52.   Accordingly, no revocation should be granted and the Complaint should be dismissed.

III.  **DEP'S COMPLAINT SHOULD BE DISMISSED BECAUSE DEP FAILED TO PLEAD FRAUD WITH PARTICULARITY (ALL COUNTS)**

53.   Even if a partial or complete revocation of the Confirmation Order were appropriate (which it is not), the Complaint also fails for the independent reason that DEP has not adequately pleaded fraud.

13

54. "The proponent of a cause of action under § 1144 must prove the following elements: (1) a representation by the debtor regarding compliance with § 1129; (2) which was materially false; (3) that was known either by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth; (4) that was made to induce the court to rely upon it; (5) that the court did rely upon; and (6) that as a consequence of such reliance, the court entered the confirmation order." *Bowman v. Bennington (In re Bennington)*, 519 B.R. 545, 548 (Bankr. D. Utah 2014) (internal citation omitted).

55. Accordingly, a plaintiff seeking revocation of a confirmation order pursuant to section 1144 must satisfy Rule 9(b)'s particularity requirements. *See, e.g.*, *In re Delta Air Lines, Inc.*, 386 B.R. at 531–32.

56. Rule 9(b) provides:

In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).

57. Here, the gravamen of DEP's claim of fraud is that the individual defendants "knew (or certainly should have known)" that the Unprojected Costs were not specifically presented to the Court in the materials provided in support of confirmation. (Cmpl. ¶¶ 46–49.)

58. DEP does not, however, "offer any evidence of the debtors intent to defraud the Court." *Skulsky v. Nyack Autopartstores Holding Co., Inc. (In re Nyack Autopartstores Holding Co., Inc.)*, 98 B.R. 659, 661 (Bankr. S.D.N.Y. 1989) (dismissing complaint seeking revocation of a confirmation order for failing to allege that fraud was on the court). The absence of such allegations is fatal to DEP's claims because the relevant fraud in a request for revocation under section 1144 "must be on the Court." *In re Motors Liquidation Co.*, 462 B.R. at 505.

14

59. Even ignoring that fatal deficiency, DEP's allegations do not state a claim for fraud. "Although under Rule 9(b) a complaint need only aver intent generally, it must nonetheless allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989); *see also In re Nyack Autopartstores Holding Co., Inc.*, 98 B.R. at 662 ("Indeed, if fraud must be inferred from the language in the complaint in order to support a claim for revocation, the complaint must be regarded as legally insufficient because it fails to particularize the fraudulent conduct . . . .").

60. Here, there are no facts alleged that could give rise to a strong inference of intent to defraud. Indeed, the only facts alleged with respect to the Unprojected Costs are that they were not presented to the Court and that the individual defendants left Alpha to work at Contura after confirmation. That is insufficient.

61. While it is true that the Unprojected Costs could only have been the result of fraud or mistake, the facts alleged by DEP are just as indicative of mistake as they are of fraud and therefore cannot give rise to a "strong inference" of fraud.

62. In fact, the only other allegations concerning the alleged fraud are that the individual defendants "knew (or certainly should have known) that the debtors' projections were materially false and misleading." (Cmpl. ¶ 46.) Such conclusory allegations are not sufficient to plead fraud.[8] *In re Longarder & Assocs., Inc.*, 855 F.2d 455, 461 (7th Cir. 1988) (denying a request to set aside confirmation of a plan of reorganization under 11 U.S.C. § 1144 where the creditor "fail[ed] to cite clear, specific and demonstrable instances involving actual fraudulent intent"; creditor merely "state[d] broadly that the debtor filed false or fraudulent financial

---

[8] Nor are DEP's allegations entitled to a presumption of truthfulness. Although a court must accept a complaint's allegations as true, it need not accept as true any allegations that are conclusory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (courts are "not bound to accept as true legal a legal conclusion couched as a factual allegation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice.").

15

statements and invite[d] the bankruptcy court to examine [the creditor's] separately filed objections [in which] the creditor complain[ed] that the debtor incorrectly stated facts"), *cert. denied* 489 U.S. 1015 (1989); *Berg v. TM Carlton House Parts., Ltd. (In re TM Carlton House Partners, Ltd.),* 110 B.R. 185, 187 (Bankr E.D. Pa. 1990) (dismissing a request to revoke an order of confirmation where pro se creditor alleged "in somewhat generalized fashion that the [financial statement filed by a general partner of the debtor] was materially false and that the alleged fraud arising from publication of the [s]tatement induced the creditor to enter into [a settlement agreement with a third-party non-debtor] and may have influenced other creditors to vote for the [p]lan").

63. Here, a handful of allegations related to purported fraud do not create a strong inference of fraudulent intent, and do not rise beyond the level of mere conclusions. Accordingly, DEP's allegations fail to state a claim.

## **RESERVATION OF RIGHTS**

64. In the sound exercise of its business judgment, ANR has agreed to compromise its claims against (i) Contura relating to the Stalking Horse APA, and (ii) the First-Lien Agent and First-Lien Lenders relating to the Unprojected Costs. If DEP succeeds in blocking either or both Settlements, ANR reserves any and all rights against those parties relating to the Plan, the Confirmation Order, the Stalking Horse APA, and any related transactions, including, without limitation, claims for breach of the Stalking Horse APA, claims for reconsideration of the Claims Reserve Order, and claims that some or all of the $200 million distributed to the First-Lien Lenders should be returned to the Distribution Cash Reserve on behalf of the Estates.

## **CONCLUSION**

65. For the reasons discussed above, ANR respectfully requests that the Court dismiss the Complaint with prejudice.

Respectfully submitted,

Dated: November 22, 2016

/s/ *Henry P. (Toby) Long, III*
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

*Counsel to Reorganized Debtors*

James C. Tecce (pro hac vice pending)
Corey Worcester (pro hac vice pending)
Eric Kay (pro hac vice pending)
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Special Litigation Counsel to Reorganized Debtors*

**CERTIFICATE OF SERVICE**

       I hereby certify that, on November 22, 2016, a true copy of the foregoing document was filed and served electronically using the Court's ECF System and by electronic mail and first class mail to the following:

Kevin W. Barrett, Esq.
Michael B. Hissam, Esq.
Bailey & Glasser LLP
209 Capitol Street
Charleston, West Virginia 25301
E-Mail: kbarrett@baileyglasser.com
       mhissam@baileyglasser.com

*Attorneys for the West Virginia Department of Environmental Protection*

Damian S. Schaible, Esq.
James I. McClammy, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
E-Mail: damian.schaible@davispolk.com
       James.mcclammy@davispolk.com

*Counsel to Citicorp North American, Inc., in its capacity as First Lien Agent, and to Contura Energy, Inc.*

Dion W. Hayes, Esq.
Sarah B. Boehm, Esq.
K. Elizabeth Sieg, Esq.
McGuireWoods LLP
800 East Canal Street
Richmond, Virginia 23219
E-Mail: dhayes@mcguirewoods.com
       sboehm@mcguirewoods.com
       bsieg@mcguirewoods.com

*Counsel to Citicorp North American, Inc., in its capacity as First Lien Agent*

                                */s/ Henry P. (Toby) Long, III*